IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. BEERS-CRUZ


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

BRYAN BEERS-CRUZ, APPELLANT.


Filed March 30, 2021.    No. A-20-903.


Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Affirmed.

Dennis P. Marks, Deputy Sarpy County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.


PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

MOORE, Judge.

## INTRODUCTION

Bryan Beers-Cruz appeals from the order of the district court for Sarpy County denying his motion to transfer his criminal case to juvenile court. Finding no abuse of discretion, we affirm.

## BACKGROUND

Bryan was initially charged with first degree murder, a Class IA felony; Conspiracy to Commit Robbery, a Class II felony; and Use of a Firearm to Commit a Felony, a Class IC felony. The charges stem from an incident that occurred on December 28, 2019, in which the victim, Randy Garcia Ramos, was shot and killed following a robbery. Bryan was involved in the robbery although another individual actually shot Ramos. Bryan was present during the shooting. At the time of this incident, Bryan was 17 years 3 months old. The initial complaint was filed in county court on December 31. Following a preliminary hearing, probable cause was found to bind the case over to district court on February 14, 2020. On March 9, an information was filed in district

- 1 -

court charging the same three counts as in the county court. Bryan filed a plea in abatement which was taken under advisement. The State thereafter filed a motion to dismiss the murder and weapons counts, which the court granted. An amended information was filed on April 16, charging Bryan with conspiracy to commit robbery and robbery, both Class II felonies, and with theft by receiving stolen property (over $5,000) and accessory to a felony -- murder in the first degree, both Class IIA felonies.

On June 30, 2020, Bryan filed a motion to transfer the case to juvenile court, and a hearing was initially held August 17. Counsel requested that the record be held open for a possible evaluation. The hearing was reset for September 10; however, Bryan asked for a continuance and the hearing was reset for September 17. Bryan asked for another continuance in order to receive the forensic psychiatric evaluation. The continued hearing was finally held on October 23 and the following evidence was adduced.

An affidavit of probable cause for Bryan's arrest was received into evidence. The affidavit states that on December 28, 2019, at 2:58 a.m., officers of the Bellevue Police Department responded to a call after a citizen saw a man who appeared to be deceased laying on the sidewalk. The victim, identified as Ramos, had gunshot wounds to his head and upper body, which ultimately resulted in his death. Officers also recovered 9mm handgun cartridges from the scene. Surveillance footage from the area at 10:14 p.m. the previous evening showed Ramos alive and laying on the sidewalk, moaning and with a hammer in his possession. The police officers learned that Ramos' vehicle, a blue 2009 Honda Civic LX, and his cell phone were both missing.

At 3:25 a.m. on December 28, 2019, Bellevue police officers were called to an attempted theft and shooting, where three male suspects were observed going though vehicles. When a resident confronted the suspects, one of the suspects fired a handgun three times. Officers recovered a 9mm handgun cartridge case.

On the same day, an officer with the Omaha Police Department (OPD) contacted the Bellevue Police Department to inform them that the handgun cartridge case from the theft and shooting incident was a probable match for other 9mm cartridge cases collected in another OPD case. The OPD officer reported that the gun belonged to a member of the Playboy Surenos gang, and that based on the photographs of the suspects in the theft and shooting case, one of the suspects appeared to be Bryan.

Ramos' missing car was found half a block away from Bryan's home, and law enforcement maintained surveillance on the vehicle. At approximately 4:12 p.m. on December 29, 2019, officers observed two individuals leave Bryan's home and get into Ramos' vehicle. Officers pursued the vehicle until it crashed. Bryan was identified as the driver of the vehicle, and Crystal C. was identified as the passenger. Officers recovered a stolen 9mm handgun from the passenger seat floorboard. The OPD crime lab determined that the magazine of the handgun had two types of ammunition inside, consistent with the cartridges found at the theft and shooting incident.

Crystal was taken to the Bellevue Police Department and was interviewed. Crystal stated that she planned with Bryan and Armando A. to commit the robbery of Ramos because they needed a car to aid them in selling drugs. Crystal told detectives that she met Ramos through Facebook and had only met him one time before the incident, and that she targeted Ramos because "he was just irrelevant" and he had a nice car.

Crystal stated that on December 27, 2019, she drove with Ramos to Bellevue to pick up Bryan and Armando at an apartment complex. Bryan sat in the front passenger seat and Armando and Crystal sat in the back seat. Armando pulled out a gun and held it to Ramos' head while placing him in a chokehold, and demanded that Ramos give up his money, car keys, cell phone, and phone passcode. Crystal stated that Armando threatened to kill Ramos if he failed to comply. Ramos eventually complied, giving Armando approximately $200 in cash, his car keys, and his phone and passcode, which Bryan kept.

According to Crystal's interview, Armando, Bryan, and Ramos exited the car, and Ramos opened the trunk and pulled out hammers, which he reportedly began swinging at Armando and Bryan. Bryan ran away from the scene, while Armando drove the car away and Crystal sat in the front passenger seat. Crystal and Armando picked Bryan up and drove to Alfredo Dominguez' home. Dominguez got in the car, and Armando told him that Ramos swung a hammer at him. Dominguez told Armando that he was "gonna smoke this fool."

According to Crystal, Armando gave Dominguez the gun used to carry out the robbery and started driving, with Crystal, Bryan, and Alfredo all in the car. As they were driving, Armando pulled the car up to Ramos as he was walking down the sidewalk, and Dominguez opened the car door and shot Ramos. They left Ramos laying on the sidewalk and drove back to Omaha. Crystal advised that the handgun the officers recovered from the stolen vehicle was the same gun that had been used to shoot Ramos. She explained that she was familiar with the gun because Bryan, Armando, and Dominguez had given her the gun to carry around the mall a few days prior to the incident with Ramos.

Crystal stated that after Ramos was shot, the occupants of the vehicle all went back to her home where they had a party along with some others. Bryan, Armando, Dominguez, and another individual left her home at some point to go steal from unlocked vehicles. She identified Bryan, Armando, and Dominguez in still photos from the theft and shooting incident that night.

In the days following the incident, Crystal used Facebook messenger to send Dominguez screenshots of Facebook posts saying that Ramos had died. Crystal deleted these messages as well as any messages with Ramos after Dominguez instructed her to do so.

The State also offered into evidence Bryan's criminal record. In June 2017, Bryan was adjudicated in juvenile court for theft by unlawful taking, less than $500, for which he was placed on a term of juvenile probation. Bryan also had various police contacts including assault in the third degree, missing juvenile, robbery, unlawful absence, unlawful occupancy, receiving stolen items, and obstructing an officer. At the time of the incident involving Ramos, Bryan was on probation in the theft by unlawful taking case and in another case in which he was adjudicated for unlawful occupancy in December 2018.

During his psychiatric evaluation, Bryan reported a history of involvement with the juvenile court, including various terms of probation for robbery and truancy. Bryan reported that for the theft charge, he was placed in the Home on Monitoring Equipment program, but admitted to smoking marijuana and cutting off his monitor during this time. He also reported being expelled from school for fighting and noted that truancy was a problem. Following his expulsion from school, Bryan was placed at Douglas County Youth Center (DCYC) and then a group home at Boys Town. Bryan ran away from his group home at Boys Town and was subsequently placed back at DCYC, before being sent to an out-of-state group home, Canyon State Academy.

Bryan spent almost 6 months at Canyon State Academy before successfully completing the program on December 18, 2019, and returning to Nebraska. Bryan's probation officer, Dennis Marks, reported that prior to attending Canyon State Academy, Bryan was not attending school, and was violating curfew, smoking marijuana, not following rules at home, and was involved in a high-speed police chase through both Nebraska and Iowa.

On March 10, 2020, the juvenile court unsatisfactorily terminated Bryan from juvenile probation in the previous theft case because of the charges in this case. The order noted that Bryan failed to successfully complete probation. Bryan also has pending charges for two counts of theft by unlawful taking, $1,500 to $5,000, which were initially filed in juvenile court but later transferred to adult court. Bryan's appeal of the transfer order was dismissed on August 4, 2020, as untimely filed. In the order transferring those charges to adult court, the juvenile court determined Bryan was no longer amenable to services provided within the juvenile justice system.

Jennifer Pommells, a high-risk probation officer, testified about the types of services offered in juvenile court. Pommells testified that juveniles are generally ordered to Canyon State Academy when they have exhausted all resources for in-home and in-state services, such as trackers, electronic monitors, reporting centers, family therapy, intensive family preservation therapy, substance abuse treatments, group homes, and foster care. Pommells agreed that if a juvenile was sent to Canyon State, it would be fair to say that either they had already been offered all of the above described services, or they were deemed to not be a good candidate for those services. Pommells testified that services are implemented in a graduated manner, starting with the least restrictive services and increasing based on a youth's behavior. Pommells explained that the most restrictive placement for juveniles is the Youth Rehabilitation Treatment Center in Kearney, where juveniles spend an average of 9 to 12 months, followed by continued probation. Pommells also testified that in a situation similar to Bryan's, there would be a concern whether a juvenile could be rehabilitated within a year.

Dr. Terry Davis performed a psychiatric evaluation on September 8, 2020. In his report, received in evidence, Davis noted that Bryan's primary problems are cannabis use and lack of school attendance. Davis also noted that Bryan may be suffering some depression. Bryan was described as "easily influenced by others" and showed problems of impulsivity, which Davis noted are both signs of immaturity. Davis reported that Bryan showed significant signs of oppositional and conduct behavior problems, but had not been diagnosed with oppositional defiant disorder or conduct disorder, and specifically noted that his behavior problems are not the result of a mental disorder. Davis also noted that Bryan does have the ability to learn from his mistakes and change any inappropriate behavior. Further, Davis noted that Bryan was described on his most recent school evaluation prior to entering the DCYC as "respectful, outgoing, can work independently, is easily redirected, and can work quickly when motivated." Davis opined that "Bryan has the intellectual, psychological, and emotional capability to understand and appreciate the nature, seriousness, and consequences of his behavior." Davis diagnosed Bryan with cannabis use disorder. At the end of his evaluation, Davis opined that transfer of Bryan's case to juvenile court would provide him with treatment modalities that will benefit him and prevent any future criminal behavior, particularly if he receives dual diagnosis treatment for substance abuse issues and depression.

On December 4, 2020, the district court entered its order denying the motion to transfer, after finding that a sound basis existed for retention of the case in district court. We will provide further details regarding the district court's findings in our analysis below.

ASSIGNMENTS OF ERROR

Bryan assigns as error the denial of his motion to transfer to juvenile court. Bryan assigns that the district court erred in finding that the State met its burden of proof establishing a sound basis for retention and denying the motion for transfer.

STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Bluett*, 295 Neb. 369, 889 N.W.2d 83 (2016). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

ANALYSIS

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, some of the allegations against Bryan put him within this category of juvenile offenders.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to Neb. Rev. Stat. § 29-1816(3) (Reissue 2016).

In the instant case, when Bryan moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in Neb. Rev. Stat. § 43-276(1) (Supp. 2019):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court

order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." See § 29-1816(3)(a) and (b).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

Bryan challenges the district court's "adoption of facts" in its order because the court noted that the current charges were those originally charged -- first degree murder, conspiracy to commit robbery, and use of a firearm to commit a felony. Bryan argues that because the court failed to analyze the statutory factors through the lens of the charges contained in the amended information, it erred in not transferring the case to juvenile court. Bryan further argues that if the court would have properly considered the correct charges and the record in analyzing the statutory factors, it would have found that he was amenable to rehabilitative treatment services, he was less culpable than his codefendants, he was motivated by peer pressure, he could successfully complete probation prior to his 19th birthday, he did not pose a threat to society, and it would be in his best interests to transfer the case to juvenile court.

We review the evidence and the district court's findings with regard to each of the factors below.

*Type of Treatment Juvenile Amenable To.*

The district court, upon review of the evidence, found that Bryan was not amenable to the services available in juvenile court. Bryan's prior juvenile probation was terminated unsatisfactorily because Bryan was repeatedly noncompliant despite the services provided to him. Further, while on probation, Bryan continued to engage in criminal behavior resulting in placement in more restrictive settings. Therefore this factor weighs against transfer.

*Whether Alleged Offense Included Violence.*

The district court noted that both Bryan and the State acknowledge that the alleged offenses included violence, and therefore found that this factor weighs against transfer. While the district court did refer to the wrong charges in its order, the four charges in the amended information are still of a serious and violent nature.

*Motivation for Commission of Offense.*

The district court determined that motivation for the offense was greed for money or property, and that it was purely self-serving and for financial gain. The district court also noted that the offenders "planned, coordinated, and calculated" the robbery, and that it was not an impulsive crime. Therefore this factor weighs against transfer.

*Age of Juvenile and Age/Circumstances of Others Involved.*

The individuals involved in the offense were Dominguez, age 22; Bryan, age 17; Armando, age 16; and Crystal, age 16. The district court surmised that Bryan wanted to commit a robbery. The court further found that while the evidence did not establish the same level of culpability as Dominguez' shooting of Ramos, it is apparent that Dominguez, as the adult in the group, did not influence or pressure Bryan into committing the robbery. Therefore this factor weighs against transfer.

*History of Juvenile.*

The district court noted that Bryan has previous juvenile adjudications in both Sarpy and Douglas County, and has spent 3 years in juvenile court for various offenses. Further, Bryan continued to commit offenses while under juvenile court supervision. Therefore this factor weighs against transfer.

*Best Interests of Juvenile.*

The district court found that, based on Davis' opinion, Bryan's best interests would be served in a dual diagnosis program to address his cannabis use disorder as well as behavior problems and possible depression. The court noted that these issues would likely better be addressed in an unrestricted capacity in juvenile court as opposed to straight incarceration given the current mandatory minimums required for sentencing, although this opinion may differ if adult probation is an available option. However, the district court questioned whether treatment could be accomplished in the short time remaining for juvenile court jurisdiction and expressed concern that a lower level of monitoring in juvenile court could lead to Bryan getting into more criminal trouble. Therefore, the district court found that this factor weighs only slightly in favor of transfer.

*Consideration of Public Safety.*

Due to Bryan's involvement as a key perpetrator in a robbery that resulted in the death of a person, while Bryan was already under the supervision of juvenile court, the district court found that it is in the best interest of public safety for Bryan to remain in adult court. This factor weighs against transfer.

*Juvenile's Ability to Consider Nature and Seriousness of Conduct.*

The district court, referring to Davis' evaluation, found that Bryan is able to appreciate the nature and seriousness of his adult conduct. Therefore this factor weighs against transfer.

*Necessity of Secure Detention/Supervision Beyond Period of Minority.*

At the time of its order, the district noted that approximately 10 months of juvenile court jurisdiction remains. The court stated that if Bryan's case is transferred to juvenile court, it is

speculative as to whether it would be in the best interest of the juvenile and public safety for him to continue in secure detention or under supervision for a period extending beyond his minority. Given this uncertainty, the district court determined that this factor neither weighs for, nor against, transfer.

*Juvenile Pretrial Service Program.*

The district court noted that Sarpy County does not have an established pretrial diversion program for Bryan's offenses, therefore this factor weighs against transfer.

*Unauthorized Use/Possession of Firearm.*

The district court noted that Bryan has not been convicted of unauthorized use or possession of a firearm, finding this factor weighs in favor of transfer.

*Juvenile Court Order Pursuant to § 43-2,106.03.*

The district court found there was no such order, therefore this factor weighs in favor of transfer.

*Gang Membership.*

The district court found that Bryan was a member of the Playboy Surenos street gang, therefore this factor weighs against transfer.

*District Court Conclusion.*

The district court concluded that in consideration of the above-discussed factors, it must decline Bryan's motion to transfer to juvenile court. The court stated:

> While a few factors support a decision to transfer, they are substantially outweighed by the other factors. In particular, the Court notes the violent nature of these crimes and the need to protect the public. [Bryan] is alleged to have committed these offenses during a period in which he was already under the supervision of juvenile court. His track record is extremely poor in prior juvenile court proceedings. Further, any rehabilitative services offered by juvenile court will cease to be available within ten months. It is apparent to the Court that the services offered in juvenile court will simply be to detain [Bryan] until he ages out of the system. The Separate Juvenile Court also made these same determinations to warrant transfer of the juvenile case to adult court. As such, the Court finds a sound basis for retention of the case, and it, therefore, overrules [Bryan's] Motion to Transfer.

*Did District Court Abuse Its Discretion?*

In our review of the record, we cannot say that the district court abused its discretion in denying Bryan's motion to transfer to juvenile court and finding that a sound basis existed to retain the case in district court. Although Davis opined that Bryan would be amenable to treatment provided by the juvenile court, Bryan has already failed to respond to the services previously provided by the juvenile court and he was unsatisfactorily released from probation because he was not amenable to services. Given the nature of the alleged crimes, Bryan's history of involvement in juvenile court, and the short time remaining before he is no longer subject to the jurisdiction of

the juvenile court, we cannot say that the district court abused its discretion in denying Bryan's motion to transfer his case to juvenile court.

## CONCLUSION

Finding no abuse of discretion by the district court in its denial of Bryan's motion to transfer the case to juvenile court, we affirm.

AFFIRMED.